UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
UNITED STATES OF AMERICA,

v.

KWASI KIRTON,

                             Defendant.
-----------------------------------------------------------X

**ORDER**

20-CR-322 (PMH)

On January 15, 2021, Defendant Kwasi Kirton ("Defendant") moved, *inter alia*, under Federal Rule of Criminal Procedure 12(b)(3)(C) to suppress certain witness identification evidence. (Doc. 34). The Government opposed Defendant's motion on February 8, 2021 (Doc. 41), and the Court heard oral argument from the parties on April 13, 2021. Following oral argument, the Court reserved decision on this branch of Defendant's motion.[1] (*See* Doc. 48). The Court has reviewed the parties' submissions and watched the video recordings of the witness interviews at issue. For the reasons set forth below, Defendant's motion is DENIED.

Federal Rule of Criminal Procedure 12(b) states in relevant part, as follows: "The following defenses, objections, and requests must be raised by pretrial motion if the basis for the motion is then reasonably available and the motion can be determined without a trial on the merits: . . . (C) suppression of evidence." Fed. R. Crim. P. 12(b)(3)(C). Witness identification testimony may be properly admitted at trial if the identification process is not the result of unduly suggestive law enforcement procedures. Separately, and if the identification of the defendant is determined to be independently reliable, testimony resulting from unduly suggestive law enforcement procedures may nonetheless be presented to the factfinder. *Neil v. Biggers*, 409 U.S. 188, 198-201 (1972). "'The court must first determine whether the pretrial identification

---

[1] The Court ruled on the other branches of Defendant's motion (Doc. 34) at a status conference held on April 13, 2021. (Doc. 48).

procedures unduly and unnecessarily suggested that the defendant was the perpetrator.'" *Brisco v. Ercole*, 565 F.3d 80, 88 (2d Cir. 2009) (quoting *Raheem v. Kelly*, 257 F.3d 122, 133 (2d Cir. 2001)). To establish that the identification was the result of unnecessarily suggestive law enforcement procedures, the defendant must establish that, under the totality of the circumstances, there is "'a very substantial likelihood of irreparable misidentification.'" *United States v. Maldonado-Rivera*, 922 F.2d 934, 973 (2d Cir. 1990) (quoting *Simmons v. United States*, 390 U.S. 377, 384 (1968)).

"'If the procedures were not suggestive, the identification evidence presents no due process obstacle to admissibility; [and] no further inquiry by the court is required.'" *Brisco*, 565 F.3d at 88 (quoting *Raheem*, 257 F.3d at 133). The evidence is then for the jury to weigh. *See Manson v. Brathwaite*, 432 U.S. 98, 116 (1977). Even where the identification did result from unduly suggestive procedures, it "may nonetheless be admissible if other factors indicate that the identification is independently reliable." *Brisco*, 565 F.3d at 89. In cases where the identification resulted from unduly suggestive procedures, to determine whether the identification is independently reliable, courts consider the following factors: "[1] the opportunity of the witness to view the criminal at the time of the crime, [2] the witness' degree of attention, [3] the accuracy of the witness' prior description of the criminal, [4] the level of certainty demonstrated by the witness at the confrontation, and [5] the length of time between the crime and the confrontation." *Biggers*, 409 U.S. at 199-20. "Against these factors is to be weighed the corrupting effect of the suggestive identification itself." *Manson*, 432 U.S. at 114. The reliability of an identification is assessed "in light of the totality of the circumstances," and no single factor is dispositive. *Raheem*, 257 F.3d at 135.

The identifications that Defendant seeks to suppress, on the grounds of the allegedly unduly suggestive manner in which the identifications were made, were made by three civilian witnesses (referred to herein as "W-1," "W-2," and "W-3"). The interviews of the three civilian witnesses were videotaped and the recordings were provided to the Court in connection with this motion practice. The Government also had previously produced the subject videos to Defendant. (Doc. 41 at 4).[2] The Court finds that there are no material issues of fact that prohibit the ruling of this motion now and that the motion may be decided without a trial on the merits. Fed. R. Crim. P. 12(d).

The interview of W-1 was conducted on or about May 8, 2020 in connection with an investigation into the homicide of Michael Toro in Mount Vernon on or about May 5, 2020. (Doc. 41 at 4; Doc. 34 at 8).[3] During the interview of W-1, the first mention of Defendant was by W-1 in response to a question about why W-1 believed that Gus killed Toro. W-1 stated, in substance and in part, that she believed the Toro murder related to a dispute between Toro and Gus's brother. (DVD: Video Clips, 000105 Interviews, 000105 Aponte & Stevens, Room1_05-08-2020_53329, "W-1 Video" at 16:28:06-16:29:10). After viewing video stills, although she stated she was "not really too sure," W-1 identified the individual in the pictures as "Gus's brother." (*Id*. at 17:07:55-17:09:40).

W-1 was shown the surveillance video of the March 26, 2020 shooting from which the referenced video stills were made, and after watching and re-watching the video, confirmed that it depicted Gus's brother. She explained that she knew Gus since 2009 and noted, again, that Toro and Gus's brother had been "beefing." (*Id*. at 17:33:52-17:41:56). While the surveillance

---

[2] The Court notes that each video's sound quality is poor throughout.

[3] On or about October 2, 2020, Negus ("Gus") Kirton, Defendant's brother, was arrested and charged with Toro's murder. (Doc. 41 at 4).

video was still visible to her and paused, W-1 was shown a photo array consisting of six individuals. After receiving detailed instructions concerning the photo array, W-1 identified Defendant, stated she recognized him from a photo on his brother "Gus Bino's" phone, and confirmed that it was the same person depicted in the surveillance video. (*Id*. 17:57:45-18:03:45).

Between each reference to Gus's brother there does not appear to have been any other discussion of him, no suggestive comments were made by law enforcement, and the identification made from viewing video stills, the surveillance video, and the photo array was simply her identification of Gus's brother. In short, the identification did not result from unduly suggestive law enforcement procedures, no further inquiry by the Court is required, and the evidence may be admitted for the jury to weigh. *Brisco*, 565 F.3d at 88; *Manson*, 432 U.S. at 116.

The interview of W-2 was conducted on or about May 13, 2020, also in connection with the Toro homicide. (Doc. 41 at 7; Doc. 34 at 8; DVD: Video Clips, 000105 Interviews, 000105 Aponte & Stevens, Room1_05-13-2020_72630, "W-2 Video" at 20:21:28-20:21:39). W-2 told officers that Negus had tried to kill him a month prior to the Toro murder because of a fight that W-2 had with Defendant, Negus's brother "Kwasi." (W-2 Video at 20:21:45-20:24:25). W-2 explained that his fight with Kwasi occurred because Kwasi tried to rob him. (*Id*.). W-2 was shown video stills and when asked if he knew the person in the images, W-2 said "that's Kwasi." (*Id*. at 20:38:26-20:38:55). W-2 then discussed his belief that the subject shooting occurred because of "K2" and a dispute over who could sell K2, noting that Defendant thought he was "the only person in the world who could sell K2." (*Id*. at 20:39:19-20:39:45). W-2 was later shown a photo array consisting of six individuals. After receiving detailed instructions

4

concerning the photo array, W-2 identified Defendant and stated he recognized him "from Third Avenue." (*Id*. at 20:45:20-20:47:15).

W-2 was familiar with Defendant and had independent knowledge of him, including having had a fight with Defendant. W-2 had identified Kwasi based on his own prior history with him and in connection with the discussion of the Toro murder prior to being presented with the video stills and photo array. The video stills and photo array were produced after lengthy gaps in time and without discussion of Defendant. Based on the Court's review of the video interview of W-2, and given the totality of the circumstances, the Court concludes the identification was not the result of any unnecessarily suggestive procedures. Accordingly, no further inquiry by the Court is required, and the evidence may be admitted for the jury to weigh. *Brisco*, 565 F.3d at 88; *Manson*, 432 U.S. at 116.

The interview of W-3 was conducted on or about May 13, 2020 in connection with the Toro homicide. (Doc. 41 at 8; Doc. 34 at 8). W-3 described a situation concerning a woman who was her friend, and who was "beefing" with W-3 over a man named Gus. (DVD: Video Clips, 000105 Interviews, 000106 Curry & Kwasi, Room1_05-13-2020_78189, "W-3 Video" at 21:50:40-21:52:48). After explaining how she learned of Toro's death (*id*. at 21:53:15-21:53:56), W-3 stated, unprompted, that she had heard that Toro was having problems with Gus's brother, who she did not know but had seen before (*id*. at 21:58:15-22:00:03). When asked whether she had ever met "Gus's brother Kwasi," W-3 said she had seen him before, did not know him personally, but saw him a couple of weeks prior walking around in Mount Vernon. (*Id*. at 22:02:34-22:03:15). W-3 was shown video stills, asked if she recognized anyone, and identified the person as "Gus's brother." (*Id*. at 22:25:59-22:26:30). Although she did not know his name, W-3 knew his face and recognized his braids as the same as "Gus's brother." (*Id*. at 22:27:14-

22:27:20). W-3 was shown a photo array consisting of six individuals. After receiving detailed instructions concerning the photo array, W-3 identified Defendant as "Gus's brother," stated that she did not know his name, and that she recognized him from walking the streets of Mount Vernon. (*Id.* 22:56:15-22:59:20).

Between each reference to Gus's brother there does not appear to have been any other discussion of him and the identification made from viewing video stills and the photo array was simply her identification of Gus's brother. She did not know Defendant's name. The only arguably suggestive comment made by law enforcement was when the interviewing officer stated Defendant's name when asking W-3 if she ever met "Gus's brother Kwasi." However, the Court finds that the brief mention was not unduly and unnecessarily suggestive of the fact that Defendant was the perpetrator. In any event, assuming the foregoing was unduly and unnecessarily suggestive, based upon the totality of the circumstances and considering the *Biggers* factors, W-3's identification of Defendant was independently reliable. W-3 expressed her familiarity with Defendant, she knew Defendant's face, she used to see him on the streets of Mount Vernon, and she recognized his braids. Although not an eyewitness to the March 26, 2020 shooting, W-3's identification of Defendant took place approximately seven weeks after the shooting. W-3 indicated that she had seen Defendant a couple of weeks prior to the identification walking around in Mount Vernon. W-3 appeared to be highly certain of her identification of Defendant, though not by name, but as Gus's brother. Accordingly, the Court finds that the identification evidence was not unduly and unnecessarily suggestive, and even if it was, the identification is independently reliable such that it may also be admitted for the jury to weigh.

Defendant contended in his motion that there were other aspects of the identification processes employed that are not known to the defense, such as how the respective witnesses were

contacted by law enforcement, how they were transported to police headquarters prior to questioning, and what the officers may have said while they were in transport. (Doc. 34 at 9). At oral argument, however, when the Court offered to conduct a *Wade* hearing at trial, Defendant asked that the Court base its decision on the video of the identification procedure rather than on testimony at a subsequent hearing. (Doc. 52 at 26:13-29:15). Accordingly, the Court does not consider the speculative arguments concerning what may or may not have occurred prior to the pretrial identifications, nor does it consider matters that are not apparent from viewing the video recordings. The Court considers those other issues raised by Defendant's motion to have been withdrawn by Defendant.

Based upon the foregoing, Defendant's motion to suppress the referenced identification evidence is DENIED. The Clerk of Court is respectfully directed to terminate the motion (Doc. 34).

SO-ORDERED:

Dated: White Plains, New York
       May 20, 2021

                                        _____
                                        Philip M. Halpern
                                        United States District Judge